OPINION OF THE COURT
Gloria M. Dabiri, J.
In this action by plaintiffs Fortunata Gangemi and Giuseppe Gangemi to recover damages for personal injuries, defendant City of New York seeks an order, pursuant to CPLR 3211 (a) (7), dismissing plaintiffs’ complaint and all cross claims as against it or an order, pursuant to CPLR 3212, granting summary judgment in its favor dismissing the complaint and all cross claims as against it.
Background
Fortunata Gangemi alleges that on September 18, 2003 she sustained injuries when she slipped and fell on a sidewalk in front of premises located at 394 Court Street in Brooklyn, New York. Fortunata maintains that her accident was caused by a cracked, broken, raised or uneven sidewalk condition, approximately 8 feet from the curb and 10 feet from the building line. Defendants David Gentile, Josephine Gentile, Ronald Gentile and Santo Gentile are the owners of the premises abutting the sidewalk. Defendant Three Ninety Four Court Restaurant, Inc., doing business as Max Court Restaurant, operates a restaurant at the premises. Records maintained by the New York City Department of Finance reflect that the premises are classified as “S2-multi-use residence-primarily two-family with a store or office.”
On October 10, 2003, plaintiffs filed a notice of claim (General Municipal Law § 50-e), and on August 16, 2004 commenced the instant action against the City of New York, the Gentiles and Max Court Restaurant. Plaintiff Fortunata Gangemi alleges that she sustained physical injury as a result of defendants’ negligence in allowing a dangerous sidewalk condition to exist. Plaintiff Giuseppe Gangemi, Fortunata’s husband, asserts a *1115 claim for loss of services. Each of the defendants has interposed an answer.
Following discovery, plaintiffs filed a note of issue and certificate of readiness on December 9, 2005. The instant motion followed.
Local Law No. 49 and Local Law No. 54 — The Sidewalk Law
In support of its motion for summary judgment the City maintains that pursuant to Local Law No. 49 (2003) of the City of New York, codified as section 7-210 of the Administrative Code of the City of New York (enacted July 16, 2003), liability for injuries arising from the sidewalk defect claimed herein shifted from the City to the owners of the abutting real property. Local Law No. 49 provides in relevant part:
“Section 1. The administrative code of the city of New York is amended by adding a new section 7-210 to read as follows:
“§7-210 Liability of real property owner for failure to maintain sidewalk in a reasonably safe condition, a. It shall be the duty of the owner of real property abutting any sidewalk, including, but not limited to, the intersection quadrant for corner property, to maintain such sidewalk in a reasonably safe condition.
“b. Notwithstanding any other provision of law, the owner of real property abutting any sidewalk, including, but not limited to, the intersection quadrant for corner property, shall be liable for any injury to property or personal injury, including death, proximately caused by the failure of such owner to maintain such sidewalk in a reasonably safe condition. Failure to maintain such sidewalk in a reasonably safe condition shall include, but not be limited to, the negligent failure to install, construct, reconstruct, repave, repair or replace defective sidewalk flags and the negligent failure to remove snow, ice, dirt or other material from the sidewalk. This subdivision shall not apply to one-, two- or three-family residential real property that is (i) in whole or in part, owner occupied, and (ii) used exclusively for residential purposes.
“c. Notwithstanding any other provision of law, the city shall not be liable for any injury to property or personal injury, including death, proximately caused by the failure to maintain sidewalks (other than *1116 sidewalks abutting one-, two- or three-family residential real property that is (i) in whole or in part, owner occupied, and (ii) used exclusively for residential purposes) in a reasonably safe condition. This subdivision shall not be construed to apply to the liability of the city as a property owner pursuant to subdivision b of this section. . . .
“§ 2. This local law shall take effect on the sixtieth day after it shall have become a law and shall apply to accidents occurring on or after such effective date.” (Emphasis supplied.)
Separate legislation concurrently enacted as Local Law No. 54 (2003) of the City of New York,[1] and codified as sections 7-211 and 7-212 of the Administrative Code, requires property *1117 owners liable under section 7-210, other than public corporations or entities, to maintain liability insurance coverage for personal injury and property damage caused by the failure of such owners to maintain abutting sidewalks in a “reasonably safe condition” (Administrative Code § 7-211). When no liability insurance is available, section 7-212 authorizes the Comptroller of the City of New York, upon consultation with the Corporation Counsel, in certain instances, to pay judgments in favor of injured parties for uncompensated medical expenses to the extent of $50,000. In such instances, the judgment is assigned to the City which “shall be entitled to enforce” it against the property owner.
Applicability of Local Law No. 49 and Local Law No. 54
Because the real property abutting the sidewalk which is at issue here is neither one-, two- or three-family residential property in whole or in part owner-occupied and used exclusively for residential purposes, nor owned by the City of New York, such property falls within the purview of section 7-210 (b) of the Administrative Code.
In opposition to the City’s motion, the Gentiles, Max Court Restaurant and plaintiffs assert that as of October 25, 2002, the City had prior written notice of the claimed defective condition (Administrative Code § 7-201) and, therefore, should be held liable, notwithstanding the subsequent enactment of the Sidewalk Law. They contend that questions of fact preclude a determination as to whether the Sidewalk Law permits the City to shift liability to adjacent landowners when, as here, it appears that the City had written notice of the defective condition prior to the date of the accident.
It is first noted that, contrary to the codefendants’ contention, the question of whether the City Council may shift to an abutting landowner liability for a sidewalk defect which predates the effective date of the Sidewalk Law is one of law. Subdivision (c) of the newly enacted section 7-210 *1118 explicitly absolves the City of New York of liability for personal injuries proximately caused by the failure to maintain sidewalks in a “reasonably safe condition” (except those abutting one-, two- or three-family owner-occupied and exclusively residential, or city-owned properties), and section 2 of Local Law No. 49 makes section 7-210 applicable “to accidents occurring on or after [its] effective date,” that is, “the sixtieth day after it shall have become law.” Section 3 of Local Law No. 54 contains a similar provision. Both Local Law No. 49 and Local Law No. 54 were signed into law by the Mayor of the City of New York on July 16, 2003 and became effective on the 60th day thereafter, September 14, 2003 (see, Garricks v City of New York, 1 NY3d 22, 26 [2003]). It is alleged that Mrs. Gangemi’s accident occurred on September 18, 2003. The Sidewalk Law, therefore, is applicable to plaintiffs’ claims.
The Gentiles and Max Court Restaurant, nevertheless, maintain that as the Sidewalk Law does not transfer ownership of sidewalks to abutting landowners, but merely shifts liability to them, fairness dictates that Local Law No. 49 be interpreted to shift liability only for those defects occurring after the law’s effective date. Max Court Restaurant points out that under traditional common-law principles both occupation and control are necessary predicates to imposition of tort liability for the defective condition of real property (see, Saunders v Bryant’s Towing, 27 AD3d 992, 993-994 [2006]; see also Gilbert Props. v City of New York, 33 AD2d 175, 178 [1969]). Moreover, they argue, under rules applicable to successor liability (see, Hansen v Filtron Mfg. Co., 282 AD2d 433, 434 [2001]), it is improper to hold them responsible for the torts of their predecessor, the City of New York.
These arguments are without merit. The contention that it is inequitable to impose liability upon property owners for defective conditions which were in existence prior to the effective date of Local Law No. 49 ignores the fact that landowners, prior to September 14, 2003, had a statutory obligation to maintain sidewalks abutting their properties in good repair and to keep those sidewalks free from snow and ice (see, Administrative Code §§ 16-123, 19-152; Gonzalez v Iocovello, 93 NY2d 539, 552 [1999] [the financial burden for repairing sidewalks is placed on property owners and when they fail to perform needed repairs the Commissioner of Transportation may do so and place a lien for the cost against the property]; Garricks v City of New York, *1119 supra [where a municipality has enacted an ordinance requiring abutting owners to remove snow from sidewalks, it may, before taking action itself, wait a reasonable time for owners to perform their legal duty]). The imposition of such a duty upon abutting landowners has long been recognized to be a constitutional exercise of municipal police power (see, Village of Carthage v Frederick, 122 NY 268 [1890]).
Moreover, general common-law principles relating to ownership of property are not applicable when, as a legitimate exercise of police power, a local ordinance or statute both specifically charges abutting landowners with a duty to maintain and repair sidewalks and imposes upon them liability to third parties for damages and injuries resulting from the breach of that duty (Hausser v Giunta, 88 NY2d 449, 453 [1996] [a landowner will be liable for injury to a third party when “a local ordinance or statute specifically charges an abutting landowner with a duty to maintain and repair the sidewalks and imposes liability for injuries resulting from the breach of that duty”], citing Willis v Parker, 225 NY 159, 164-165 [1919]; see also Sverdlin v Gruber, 289 AD2d 475, 476 [2001]; Kline v City of New York, 295 AD2d 481 [2002]; Gilbert Props. v City of New York, supra).
Max Court Restaurant further argues that because repairs to a sidewalk involving an area greater than 25 square feet may not be performed without obtaining a permit from the New York City Department of Transportation (34 RCNY 2-09 [f] [2] [i]), the Gentiles, as the adjacent landowners, could not perform repairs without the approval of the City. Max Court Restaurant argues that, therefore, it is unfair to hold the Gentiles liable for injuries caused by defects which could not be repaired without the City’s approval. It maintains that because the City owns the sidewalk and controls it through the issuance of permits, the adjacent landowners should not be liable for accidents occurring on sidewalks which they do not own and over which they have no control.
This argument is unavailing. There is no indication that any codefendant applied for a permit from the City and that an application for same was denied (see generally, Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 772-773 [1991]). Moreover, as previously noted, Local Law No. 49 imposes no additional maintenance duty upon abutting landowners than existed under prior law. Administrative Code §§ 16-123 and 19-152 continue to impose an obligation upon property owners to *1120 maintain abutting sidewalks in good repair and to keep those sidewalks free from snow and ice.
Legislative History of Local Law No. 49 and Local Law No. 54
As has been noted, Administrative Code §§ 16-123 and 19-152, prior to enactment of the Sidewalk Law in 2003, obligated property owners to maintain adjacent sidewalks. However no statute or city ordinance imposed corresponding tort liability upon owners whose failure to clean or repair resulted in injuries to third parties. Prior to September 14, 2003, unless the property owner affirmatively created the defective condition, negligently cleaned or repaired the sidewalk, or used the sidewalk for a special purpose, the owner was free from liability to third parties for injuries caused by the owners’ failure to perform the duties prescribed by sections 16-123 and 19-152 of the Administrative Code (see, Devine v City of New York, 300 AD2d 532, 533 [2002]; Otero v City of New York, 213 AD2d 339, 339-340 [1995]; Brady v Maloney, 161 AD2d 879, 880 [1990]). The undesirable effect of this anomaly in the law was to discourage property owners from undertaking needed repairs for fear that by doing so they would incur liability should an injury be caused to someone using the repaired sidewalk. If, on the other hand, the property owner made no repair and made no special use of the sidewalk, the owner could remain free from liability and the City would be solely responsible for injuries resulting from sidewalk defects (see, Angulo v City of New York, 5 AD3d 707 [2004]; Salica v Lenny’s Clam Bar, 292 AD2d 438 [2002]; see also Testimony of Michael A. Cardozo, Corporation Counsel for City of NY, before Comm on Transp of Council of City of NY, Nov. 12, 2002). The legislative history of Local Law No. 49 and Local Law No. 54 reflects that, as a result, the City bore the brunt of the financial burden for personal injury claims arising from defective sidewalk conditions. It is reported that in the three years preceding introduction of the sidewalk legislation, the City of New York was served with more than 10,800 sidewalk-related claims and paid out $189 billion in related verdicts, settlements and expenditures (Testimony of Michael A. Cardozo, supra at 3, 12; see also Report of Infrastructure Div, Comm on Transp of Council of City of NY, Nov. 12, 2002).[2]
*1121 In signing Local Law No. 49 and Local Law No. 54, Mayor Michael R. Bloomberg remarked:
“New York City has 12,750 miles of sidewalks. Laid end to end they would stretch halfway around the world. It would cost the City billions of dollars to hire sidewalk repair crews to repair all sidewalk defects and keep the sidewalks perfectly free of defects. Under current law, property owners are required to keep their sidewalks in good repair and free of snow and ice. However, if they fail to comply with this statutory duty and someone is injured as a result, they don’t get sued, the City does. This legislation transfers liability for sidewalk accidents from the City to the property owners who already have the duty to keep the sidewalks in good repair. . . .
“This bill will not only save the City millions of dollars but . . . will mean safer sidewalks and fewer injuries. . . .
“This bill will [also] require property owners, other than . . . owners of one-, two- or three-family homes, to have a policy of personal injury and property damage liability insurance to cover their li *1122 ability for sidewalk accidents. . . .
“Most property owners already have liability insurance. On the slim chance that a property is not covered by insurance, this bill also authorizes the City Comptroller ... to make payments for uncompensated medical expenses to persons who are injured in sidewalk accidents and who obtained a judgment against a property owner, but were unable to collect on the judgment. ... In this way, [Local Law No. 49 and Local Law No. 54] strike a reasonable and compassionate balance between the principle that the City should not be liable for the wrongs of another and the principle that persons injured by the wrongs of another should receive compensation.” (Mayor Michael R. Bloomberg Signs Tort Reform Legislation, Office of Mayor Press Release 200-03, July 16, 2003.)
The Takings Clause
The Gentiles and Max Court Restaurant further argue that Local Law No. 49 and Local Law No. 54 violate the Fifth and Fourteenth amendments to the United States Constitution, and sections 6 and 7 of article I of the New York Constitution, which prohibit a “taking” of private property for public use without just compensation. They maintain that because sections 7-210 and 7-211 of the Administrative Code require an abutting landowner to incur the cost of repairing a city-owned sidewalk and to pay potential damages for injuries sustained by third parties, or the cost of procuring insurance to protect against such risks, the law results in a de facto taking of private property for public use. They assert that there is no just compensation to the abutting property owners, in that, inter alia, title to the sidewalk remains with the City and property owners receive no additional rights or benefits.
The Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides that private property shall not “be taken for public use, without just compensation”[3] (see generally, Armstrong v United States, 364 US 40, 49 [1960]; Penn Central Transp. Co. v *1123 New York City, 438 US 104, 123-124 [1978]). The Takings Clause of the Fifth Amendment does not prohibit governmental interference with property rights, per se, but rather insures compensation in the event that government interference goes too far (Lingle v Chevron U. S. A. Inc., 544 US 528, 536-537 [2005]; First English Evangelical Lutheran Church of Glendale v County of Los Angeles, 482 US 304, 314 [1987] [the Takings Clause “does not prohibit the taking of private property, but instead places a condition on the exercise of that power”]; Armstrong v United States, 364 US at 49 [Takings Clause prevents government “from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole”]).
The quintessential taking involves a direct governmental appropriation of, or physical invasion upon, private property (Armstrong v United States, 364 US at 49; Lingle v Chevron U. S. A. Inc., 544 US at 537 [the paradigmatic taking is a direct appropriation or physical invasion]; Palazzolo v Rhode Island, 533 US 606, 617 [2001] [“The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use”]). The Supreme Court in Pennsylvania Coal Co. v Mahon (260 US 393, 415 [1922]), recognized, however, that government regulation of private property may, in some instances, be “so onerous that its effect is tantamount to a direct appropriation or ouster — and that such ‘regulatory takings’ [are also] compensable under the Fifth Amendment” (Lingle, 544 US at 537, 539 [the Supreme Court’s taking jurisprudence aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain]). Thus, “governmental regulations which limit owners’ rights to possess, use or dispose of property may also amount to a ‘taking’ of the affected property” (Manocherian v Lenox Hill Hosp., 84 NY2d 385, 393 [1994]).
Two categories of governmental regulation of private property have generally been deemed to be per se “takings” for Fifth Amendment purposes: (a) a permanent physical invasion of property, however minor, and (b) a regulation that “completely deprive[s] an owner of ‘all economically beneficial us[e]’ of her property” (Lingle, 544 US at 538, quoting Lucas v South Carolina Coastal Council, 505 US 1003, 1019 [1992]). “Outside *1124 [of] these two relatively narrow categories (and the special context of land-use exactions[4] . . .), regulatory takings challenges are governed by the standards set forth in Penn Central Transp. Co. v New York City, 438 US 104[, 123-124]” (Lingle, 544 US at 538; see also Consumers Union of U.S., Inc. v State of New York, 5 NY3d 327, 357 [2005]).
In Penn Central Transp. Co. (supra), the Supreme Court identified several factors which serve as a guideline for resolving regulatory taking claims that do not fall within the per se physical taking rule (438 US at 124; Lingle, 544 US at 538-539; Matter of Friedenburg v New York State Dept. of Envtl. Conservation, 3 AD3d 86, 95 [2003]). “Primary among those factors are ‘[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations’ ” (Lingle, 544 US at 538-539, quoting Penn Central Transp. Co., 438 US at 124). Another consideration in discerning whether a taking has occurred is the “ ‘character of the governmental action’ — for instance whether it amounts to a physical invasion or instead merely affects property interests through ‘some public program adjusting the benefits and burdens of economic life to promote the common good’ ” (Lingle, 544 US at 539 [emphasis supplied], quoting Penn Central Transp. Co. v New York City, 438 US at 124).
No physical invasion or ouster has been claimed or demonstrated by the Gentiles or Max Court Restaurant in this case (compare, United States v Pewee Coal Co., 341 US 114 [1951] [government seizure of coal mine operations is a taking]; United States v General Motors Corp., 323 US 373 [1945] [government occupation of private warehouse leased to General Motors constitutes taking]; Loretto v Teleprompter Manhattan CATV Corp., 458 US 419 [1982] [state law requiring landlords to allow cable companies to install cable facilities in apartment buildings effected a taking]). Nor is it claimed that Local Law No. 49 and Local Law No. 54 “completely deprive” the defendants of “all economically beneficial us[e]” of their property (compare, United States v Causby, 328 US 256 [1946] [overflights destroyed use of land as chicken farm]; United States v Cress, 243 US 316 [1917] [repeated flooding of land caused by water project]).
*1125 Nor, in opposition to the motion, have the codefendants raised an issue of fact as to whether Local Law No. 49 and Local Law No. 54 interfere with a distinct investment-backed expectation (Lingle, 544 US at 539; compare, Armstrong v United States, supra [materialman’s lien on uncompleted boat conveyed to government upon default by contractor, along with manufacturing materials, constitutes taking in that total value of the lien was destroyed]; Pennsylvania Coal Co. v Mahon, 260 US 393 [1922] [statute which made it commercially impracticable for claimant, who held mining rights, to remove coal was “taking”]; Hudson County Water Co. v McCarter, 209 US 349, 355 [1908] [if height restriction makes property wholly useless, “the rights of property . . . prevail over the other public interest”]). Rather than a “taking” violative of the federal and state constitutions, the Sidewalk Law merely effectuates a public adjustment of the burdens of economic life in order to promote, what the New York City Council and the City’s chief executive have determined to be, public safety and the general welfare (Lingle, 544 US at 541; French v Barber Asphalt Paving Co., 181 US 324 [1901] [apportionment of street paving cost upon abutting lots according to their frontage, without a hearing, did not constitute “taking” of property without due process]; Penn Central Transp. Co., 438 US at 124-125 [the exercises of the taxing power is an obvious example of constitutional government action adversely affecting economic values]).
A landowner who claims that government regulation has effected a taking of his or her property bears the heavy burden of the presumption of constitutionality that attaches to the regulation and of proving every element of his claim beyond a reasonable doubt (de St. Aubin v Flacke, 68 NY2d 66, 76 [1986]). The Gentiles and Max Court Restaurant have not met their burden of demonstrating that, or succeeded in raising an issue of fact as to whether, Local Law No. 49 and Local Law No. 54 are unconstitutional police regulations amounting to either a per se taking or a taking under the balancing test of Penn Central Transp. Co. v New York City (supra; Matter of Friedenburg v New York State Dept. of Envtl. Conservation, 3 AD3d 86, 93 [2003]). Restrictions imposed by government in the exercise of its police power, reasonably related to public health, safety or welfare, characteristically affect the value of private property. But “a property owner does not prove a taking solely by evidence that the value [of the property] has been reduced by the regulation, even if it has been substantially reduced” (de St. *1126 Aubin v Flacke, 68 NY2d at 76-77). Reductions or increases in the value of property which may occur by reason of such government action are considered “incidents of ownership” rather than a “taking” in the constitutional sense (City of Buffalo v Clement Co., 28 NY2d 241, 255 [1971], citing Danforth v United States, 308 US 271, 285 [1939]; see also Tahoe-Sierra Preservation Council, Inc. v Tahoe Regional Planning Agency, 535 US 302, 327 [2002] [“where an owner possesses a full ‘bundle’ of property rights, the destruction of one ‘strand’ of the bundle is not a taking”]; Matter of Golden v Planning Bd. of Town of Ramapo, 30 NY2d 359, 381 [1972] [limits in the use or depreciation in the value of property are invariably the product of police regulation]).
Nor has it been demonstrated that the liability insurance requirement of Administrative Code § 7-211 effects an unconstitutional “taking” or is an “unreasonable” exercise of municipal police power (see e.g., Matter of Malone Parachute Club v Town of Malone, 197 AD2d 120 [1994] [town board direction that parachuting club members obtain liability insurance before using town airport valid exercise of police power]; Goldberg v Corcoran, 153 AD2d 113, 119-120 [1989] [state in exercise of police powers may regulate medical fees]; Niagara Recycling v Town Bd. of Town of Niagara, 83 AD2d 335 [1981] [licensing of new and existing waste disposal facilities and requiring, inter alia, liability insurance in exercise of police power]; Richard’s Serv. Sta. v Town of Huntington, 79 Misc 2d 834 [1974], mod 47 AD2d 963 [1975] [ordinance requiring tow trucks to be licensed by town and to have fixed minimum insurance coverage]).
The New York State Constitution grants local governments the power to adopt laws, not inconsistent with the provisions of the Constitution or any general law, relating to the care and management of its roads, sidewalks and property (NY Const, art IX, § 2 [c] [ii] [6]; see also Municipal Home Rule Law § 10 [1] [ii] [a] [6]). Neither the State’s Constitution nor any state statute prohibits a municipality from transferring liability for sidewalk maintenance to abutting landowners (see, Barone v Town of Huntington, 211 AD2d 691, 692 [1995]). Indeed, the New York Court of Appeals in Hausser v Giunta (88 NY2d 449, 454 [1996]) upheld a similar City of Long Beach ordinance imposing upon landowners liability for injuries caused by defective conditions on sidewalks abutting their premises. In doing so, the Court concluded that section 11 (1) (j) of the Municipal Home Rule Law (entitled “Restrictions on the adoption of local *1127 laws”) does not render invalid the enactment of a code transferring the locality’s liability for unsafe sidewalks to property owners, as no state statute has been enacted restricting such transfer of liability (88 NY2d at 452-454; see also Willis v Parker, 225 NY 159 [1919]; Fishelberg v Emmons Ave. Hospitality Corp., 26 AD3d 460 [2006]).
Due Process
Max Court Restaurant argues that the Gentiles’ procedural due process rights were violated because they were not afforded notice and an opportunity to be heard.[5] It is well settled that the failure to give notice of the consideration of proposed legislation does not implicate due process concerns (P & N Tiffany Props., Inc. v Village of Tuckahoe, 33 AD3d 61, 63 [2d Dept 2006], citing Sheldon v Town of Highlands, 73 NY2d 304, 307-308 [1989]). Due process requires “notice and hearing” in quasi-judicial or adjudicatory settings, and not with respect to the adoption of general legislation (Zubli v Community Mainstreaming Assoc., 102 Misc 2d 320 [1979], affd 74 AD2d 624 [1980], mod 50 NY2d 1024 [1980]; see also Minnesota State Bd. for Community Colleges v Knight, 465 US 271, 283 [1984] [“The Constitution does not grant to members of the public generally a right to be heard by public bodies making decisions of policy”]). The Legislature is deemed to have made proper inquiry into the relevant facts and to have conclusively determined the benefits of the proposed law (id.; Sheldon v Town of Highlands, 73 NY2d 304, 307-308 [1989]).[6]
The City has made a prima facie showing that Local Law No. 49 and Local Law No. 54, enacted under its police power, bear a reasonable connection to the public’s health, safety and welfare (Fred F. French Inv. Co. v City of New York, 39 NY2d 587, 596 [1976], appeal dismissed, cert denied 429 US 990 [1976]). Plaintiffs and codefendants, in opposition to summary judgment, fail to overcome the strong presumption of constitutionality of the Sidewalk Law by offering evidence that the law bears *1128 no reasonable relationship to public health, safety or welfare (D’Angelo v Cole, 67 NY2d 65, 69 [1986]).
Equal Protection
Max Court Restaurant further argues that the equal protection rights of codefendants, and those similarly situated, have been violated because Local Law No. 49 and Local Law No. 54, even assuming they address a legitimate governmental purpose, do so through arbitrary and capricious means (see generally Village of Willowbrook v Olech, 528 US 562, 564 [2000]). In this regard, it points to the distinction in the Sidewalk Law between the owners of one-, two- and three-family dwellings which are owner occupied and used exclusively for residential purposes, and the owners of four-or-more-family homes and commercial real property. It asserts that the legislative history does not reflect that any specific study supports this distinction between essentially residential landowners and commercial landowners.
Codefendants, however, fail to demonstrate how the Sidewalk Law treats them any differently than similarly situated property owners, to wit, owners of commercial property and multiple dwellings (compare Village of Willowbrook v Olech, supra). “The basic guarantee of the Equal Protection Clause is that government will act evenhandedly in allocating the benefits and burdens prescribed by law and will not, without at least a rational basis, treat similarly situated persons differently or disparately” (Weaver v Town of Rush, 1 AD3d 920, 921 [2003], citing Cleburne v Cleburne Living Center, Inc., 473 US 432, 439 [1985], and Plyler v Doe, 457 US 202, 216 [1982]).
. Nonetheless, “the Equal Protection Clause is satisfied [in this instance] as there is a plausible policy reason for the classification” utilized (Nordlinger v Hahn, 505 US 1, 11 [1992]). “[I]nequalities that result not from hostile discrimination, but occasionally and incidentally in the application of a [law] that is not arbitrary in its classification, are not sufficient to defeat the law” (Matter of Huckaby v New York State Div. of Tax Appeals, Tax Appeals Trib., 4 NY3d 427, 439 [2005], cert denied — US —, 126 S Ct 546 [2005], quoting Maxwell v Bugbee, 250 US 525, 543 [1919]). Once again, the law is presumed to be constitutional and the burden is upon an opponent to prove otherwise beyond a reasonable doubt (Nordlinger v Hahn, 505 US 1, 15 [1992]; Chilberg v Chilberg, 13 AD3d 1089 [2004]; Port Jefferson Health Care Facility v Wing, 94 NY2d 284, 289 [1999], cert denied 530 US 1276 [2000]).
Before the New York City Council during its consideration of the sidewalk legislation was, inter alia, the June 27, 2003 report *1129 of its Transportation Committee which concluded that small property owners who reside on the premises are less likely than commercial property owners to have resources available to them or to be able to bear the costs of maintenance and repairs (Report of Infrastructure Div, Comm on Transp of Council of City of NY, June 27, 2003). Also before the City Council was a report by the Office of the Corporation Counsel indicating that two thirds of sidewalk defect-related tort cases filed against the City involved sidewalks abutting commercial properties and multiple dwellings (see, Testimony of Michael A. Cardozo, Corporation Counsel of City of NY, before Comm on Transp of Council of City of NY, Nov. 12, 2002). Thus, it cannot be said that the exception in the Sidewalk Law for one-, two- and three-family homeowners lacks a rational basis, thereby, rendering the law arbitrary and capricious (Trump v Chu, 65 NY2d 20, 25 [1985], appeal dismissed 474 US 915 [1985] [taxing, like social and economic legislation that neither classify on the basis of a suspect class nor impair a fundamental right, must be upheld if the challenged classification is rationally related to achievement of a legitimate state purpose]; see also Gauthier v Gabel, 44 Misc 2d 887, 893 [1964], affd 16 NY2d 720 [1965]).
The question of whether Local Law No. 49 and Local Law No. 54, as enacted, were the most efficacious means of achieving the City Council’s desired goal is beyond the scope of judicial review (Health Ins. Assn. of Am. v Harnett, 44 NY2d 302, 312 [1978]; see also Big Apple Food Vendors’ Assn. v City of New York, 228 AD2d 282, 282-283 [1996], lv denied 89 NY2d 807 [1997]; Huggins v City of New York, 126 Misc 2d 908, 910-911 [1984]). The choice of means was within the Legislature’s prerogative (Huggins, 126 Misc 2d at 911).
Remaining Contentions
Additionally, the Gentile defendants contend that the Sidewalk Law cannot pass constitutional muster because they lack an insurable interest in the sidewalk and, therefore, cannot protect themselves against the risk of liability which the law imposes. They maintain that this constitutes a further taking of the private property of landowners (their money) without consent, and giving it to another (injured third parties). This contention also lacks merit. An adjoining landowner is not precluded from obtaining liability insurance. In fact, as discussed, Administrative Code § 7-211 requires
“[a]n owner of real property, other than a public corporation, ... to have a policy of personal injury *1130 and property damage liability insurance for such property for liability for any injury to property or personal injury, including death, proximately caused by the failure of such owner to maintain the sidewalk abutting such property in a reasonably safe condition.”
Prior to enactment of Administrative Code § 7-211, many landowners carried such liability insurance. And, as previously discussed, under the balancing test of Penn Central Transp. Co. v New York City (supra), imposition of liability for breach of the duty imposed here does not result in an unconstitutional “taking” (438 US at 124-125).
The Gentiles further argue that the Sidewalk Law is constitutionally suspect because it imposes a greater duty upon landowners with respect to city-owned sidewalks than currently exist with respect to real property owned, by the abutting landowners. They claim that because a person injured on a city sidewalk need not prove that the abutting landowner created or had notice of the claimed defect in order to recover, it imposes a greater duty upon landowners. This argument is simply without merit. The Sidewalk Law does not impose absolute tort liability upon landowners for injuries sustained on an abutting sidewalk (see, Padob v 127 E. 23rd St. LLC, NYLJ, Sept. 30, 2005, at 18, col 1 [Sup Ct, NY County, Edmead, J.]). In order to recover, the injured party is still required to demonstrate “(1) the existence of a duty on the defendant’s part as to the plaintiff, (2) a breach of this duty, and (3) an injury to the plaintiff as a result thereof’ (Gaeta v City of New York, 213 AD2d 509, 510 [1995]; see also Perlongo v Park City 3 & 4 Apts., Inc., 31 AD3d 409 [2006]; Fernandez v 1330 3rd Ave. Corp., 10 Misc 3d 1057[A], 2005 NY Slip Op 51995[U] [2005]). In order to prove a breach of duty in most slip/trip and fall cases, the plaintiff must show that the defendant created the condition which caused the accident or that the defendant had actual or constructive notice of the condition (Fernandez v 1330 3rd Ave. Corp., 10 Misc 3d 1057[A], 2005 NY Slip Op 51995[U] [2005]).
Accordingly, the motion by the City of New York is granted and plaintiffs’ complaint and all cross claims against it are dismissed (CPLR 3211 [a] [7]; 3212).

. Local Law No. 54, enacted July 16, 2003, reads in relevant part as follows:
“Section 1. The administrative code of the city of New York is amended by adding a new section 7-211 to read as follows:
“§ 7-211 Personal injury and property damage liability insurance. An owner of real property, other than a public corporation ... or a state or federal agency or instrumentality, to which subdivision b of section 7-210 of this code applies, shall be required to have a policy of personal injury and property damage liability insurance for such property for liability for any injury to property or personal injury, including death, proximately caused by the failure of such owner to maintain the sidewalk abutting such property in a reasonably safe condition. The city shall not be liable for any injury to property or personal injury, including death, as a result of the failure of an owner to comply with this section.
“§ 2. The administrative code of the city of New York is amended by adding a new section 7-212 to read as follows:
“§ 7-212 Authority to make payments for personal injury, including death, where abutting property owner liable pursuant to section 7-210 is uninsured, a. Where a judgment for personal injury, including death, obtained against an abutting property owner pursuant to section 7-210 of this code is unsatisfied for a period of at least one year following entry of such judgment . . . , the comptroller, after consultation with the corporation counsel, is hereby authorized and empowered to make a payment for such personal injury, including death, “b. Any such payment shall be made in the discretion of the comptroller and shall not be made as a matter of right. The amount of such payment shall not exceed uncompensated medical expenses. Payment may be in a single payment, or may be made in periodic payments. No such payment or periodic payments shall exceed fifty thousand dollars in total with respect to any unsatisfied judgment and the total of all such payments for all judgments in any fiscal year shall not exceed four million dollars. . . .
*1117 “d. Before the comptroller shall make such payment, he or she shall require the petitioner to execute an assignment of the judgment to the city. After assignment the city shall be entitled to enforce the judgment. To the extent that the city collects money on the judgment in excess of the payment or payments made to a petitioner pursuant to this section, such excess amount shall be paid to the petitioner after deducting the city’s expenses. . . .
“§ 3. This local law shall take effect on the sixtieth day after it shall have become a law and shall apply to accidents occurring on or after such effective date.” (Emphasis supplied.)

. The Report of the Infrastructure Division, Committee on Transportation, in favor of approving Local Law No. 49, notes:
“According to figures provided by the New York City Comptroller’s Office and the New York City Law Department, the following represents the number of claims filed against the City over the last three fiscal years, as well as the total amount of *1121 expenditures and payouts made by the City:
“Sidewalk Claims Filed Judgment & Claims Expenditure
“FY 2002 3,267 $53.4 million
“FY 2001 3,606 $76 million
“FY 2000 3,975 $58.5 million
“FY 1999 4,140 $57.8 [million]
“This legislation is designed to place liability with the party whose legal obligation it is to maintain and repair sidewalks that abut them — the property owners. [The legislation] . . . will hopefully have the desired result of encouraging such property owners to better maintain and more expeditiously repair the sidewalks for which they are legally responsible. If successful, such incentive will result in safer sidewalks City-wide thereby reducing the number of occurrences of damage or injury therefrom.
“Finally, it should be noted that the placement of liability directly upon property owners would not apply under the bill to one-, two- or three-family residential real property that is, in whole or in part, owner-occupied and used exclusively for residential purposes. This exception for such properties is out of recognition for the fact that small property owners who reside at such property have limited resources and it would not be appropriate to expose such owners to exclusive liability for sidewalk maintenance and repair.”

. New York Constitution, article I, § 7, similarly provides “(a) Private property shall not be taken for public use without just compensation.” Article 1, § 6 provides, “No person shall be deprived of life, liberty or property without due process of law.”
New York courts routinely rely upon federal cases in their determination of “taking” claims under the State Constitution (see Wantanabe Realty Corp. v *1123 City of New York, 315 F Supp 2d 375, 401 [SD NY 2003]; Uhlfelder v Weinshall, 10 Misc 3d 151 [2005]).

. Exactions have been defined as land-use decisions conditioning approval of development on the “dedication of property to public usé” (Matter of Smith v Town of Mendon, 4 NY3d 1, 10 [2004]; Consumers Union of U.S., Inc. v State of New York, 5 NY3d 327, 354 [2005]).

. NY Constitution, article I, § 6; US Constitution Fifth Amendment.
“It is axiomatic that there is no standing to complain where an alleged defect in or violation of a statute does not injure the party seeking redress” (Matter of Sarah K, 66 NY2d 223, 240 [1985], cert denied sub nom. Kosher v Stamatis, 475 US 1108 [1986]).

. The City Council’s Transportation Committee conducted public hearings and issued reports, dated November 12, 2002 and June 27, 2003. The Sidewalk Law was enacted by the City Council on June 27, 2003 and signed into law by Mayor Michael R. Bloomberg on July 16, 2003. However, the law did not become effective until 60 days after it became law.